court Elizabeth Butler for appellant Ronald Hiddle. I'm intending to reserve five minutes for rebuttal. There is no question that the City of Stockton, California terminated Fire Chief Ronald Hiddle, a devout Christian, because he quote, used city time and resources to attend a religious leadership event. Those exact words appear in the removal notice that the city issued to Chief Hiddle as the first reason for his termination. Once the city learned that Chief Hiddle had attended a leadership event that included a religious perspective, it launched an investigation into his conduct. But the outcome of that investigation was predetermined. The same day the city issued the notice of investigation, City Manager Dice threatened Chief Hiddle with a demotion and told Chief Hiddle that he would probably win a long expensive legal battle. In fact, the city never even looked into the content of the global leadership summit to determine whether it provided bonafide leadership training. Did he ask in advance whether that was what they what what what the supervisor had in mind when she suggested that he find a leadership training program? So she said that Montez said in her affidavit, very specifically directed they find a program intended for fire chiefs, or at least for upper management of public entities. My hope was that he would improve the leadership skills that are specific to public sector management. And she suggested places where he might look. And then she goes on to say, Chief Hiddle did not contact me check with me or obtain approval before he unilaterally attend decided to attend the Willow Creek summit. If he had checked with me, I would never approved him to attend that program on city time. And not they were they were paid for their attendance and they they and they and they went at city expense. Yes, Your Honor, a few responses to that. So there's no city policy that requires Chief before he goes to leadership training. But Chief Hiddle testified that Montez never specified that he needed to obtain public leadership, public sector leadership training or fire department specific leadership training. So there is a factual dispute on that issue. But I would submit that even that factual dispute is not material, because there is evidence in the record that the leadership training did meet the specifications that Montez claims that she gave Chief Hiddle. So the leadership summit included a specific speaker Daniel Pink, who is also a speaker at the International City County Managers Association, which is one of the entities that Montez claims she told Chief Hiddle would have been appropriate leadership training. But I did not ever look into the type of leadership training that the summit provided. So for it to now say that it terminated Chief Hiddle, because he didn't attend the specific kind of leadership training that they wanted to attend. It just has no support in the record at all. What about the others that he took and approved payment for their work as a workday, in effect, and at city expense? Yes, others did accompany Chief Hiddle. So the others who came all held some type of management position in the fire department. So Chief Hiddle brought them along, so they could also learn from this leadership event. That was his decision. No one told him. That was his decision. But as fire chief, he didn't have to obtain approval from anybody else to bring the other managers. And I don't believe the city has ever raised the issue that Chief Hiddle wasn't allowed to obtain leadership training for other managers within the fire department. The city's issue with the training has always been the religious perspective. So the city's documents, which all refer to the religious nature of the leadership event, along with discriminatory comments made by the city's decision makers, provide conclusive evidence that religious discrimination was at least a motivating factor in Chief Hiddle's termination. But at minimum... What if they had said, in effect, he went to a baseball game on city time and city expense, and he took three others with him? Right. Well, that would not be... Would that have been a ground to discipline him and take action against him? I would say yes. I don't see what benefit the city could have obtained from Chief Hiddle taking his other managers to a baseball game, but that doesn't implicate Title VII. I know it doesn't implicate Title VII, but the description of it as a religious event, as religious, it doesn't strike me as being the critical factor where they were assuming it was religious. It doesn't seem to me to be the critical concern of the city was that he went to a program which the city did not think met its requirement when they told him to go. And that was the basis, and that he took other people with him at his expense. Your Honor, I would push back on that characterization. I think if you look into the Largent Report, so the city's investigation report, which city manager Dice said he fired Chief Hiddle based on the findings of the Largent Report. And the only thing that the Largent Report looks into with respect to the Global Leadership Summit is whether or not the summit was religious. And that is reflective of the city's religious discrimination. So that is pretty conclusive proof, in my opinion, that the only thing that the city cared about was the religious character of the summit. In addition to these documents, the city decision makers also made discriminatory comments against Chief Hiddle. So Deputy City Manager Montes accused Chief Hiddle of being part of a Christian coalition. This is something she said in a very pejorative tone, and she said it in connection with him obtaining leadership training. It was immediately after that the city had discovered that he had obtained leadership training that had this religious perspective. The opposing counsel argues that Montes got this term from an anonymous letter. Does that make a difference? No, Your Honor, it doesn't. Because even if some person was the origin of the Christian coalition term, Montes adopted this discriminatory term, and she used it against Chief Hiddle. So she can't shield herself from her own discriminatory comment by claiming that the comment came from somebody else. Additionally, both Montes and Dice used the term church click in connection with the leadership training and Chief Hiddle's position with the other Christians in the department. This is also reflective of their animus. Click is a term that is never used in a positive way, and if the panel has any kind of trouble thinking about this, I ask you to substitute in another protected characteristic. So say a Black employee was accused of being part of a Black click and attending Black leadership training and was obviously discriminated against. I submit that this is the exact same case. Can I ask one particular question? They gave him an opportunity to provide an explanation, which he attended, I believe, with his attorney. He refused to provide any kind of an explanation, and he said this was a denial of due process, which is curious since he was an at-will employee, but they were giving him an opportunity to answer, and he didn't. So Chief Hiddle offered explanations to Inspector Largent throughout the investigation, but I believe what you're referring to is the hearing, basically once the city had already made the termination decision, and Chief Hiddle didn't have the opportunity to call any witnesses or provide any kind of evidence at that hearing, so his counsel at the time made the decision not to argue further with the city at that particular hearing, but Chief Hiddle certainly all throughout the investigation process did provide numerous explanations for why he chose the Global Leadership Summit as the leadership event and the benefits that that event provided. If the panel doesn't have any further questions, I will reserve the remainder of my time for rebuttal. I don't hear any other questions, so I think you can pause and prepare for your rebuttal. Mr. Wilson. Thank you, Your Honor. Spencer Wilson on behalf of the Appellee City of Stockton. I do want to address a few of the points that Ms. Butler made, but first I would like to focus on the real reason that the city terminated Hiddle's at-will employment, and that is that he engaged in rampant mismanagement of the fire department, marked by improper favoritism and failure to maintain order and discipline. This drew criticism from at least two city managers, the city council, members of the fire department, concerned citizens, and members of the media, and this was documented in an exhaustive investigative report. The report and exhibit span nearly 2,000 pages. Hiddle concedes or fails to meaningfully dispute most of the material facts related to his misconduct. He concedes that he co-owned a vacation home with three subordinates, including the union president, and he never formally disclosed this to the city. This resulted in actual and perceived conflicts of interest. For example, as Hiddle conceded, one of his co-owners, Dwayne, engaged in conduct constituting time card fraud. But Hiddle defended... Because notwithstanding the evidence of other problems with Mr. Hiddle, our case law and the statute itself says we only have to consider whether religion was a motivating factor, and so when we look at the larger report, there seems to be a significant focus on the characteristics of the large focus of the report, so what's the basis for saying that's not a motivating factor? So I think it's fair to say that one of the many examples of his favoritism and his mismanagement of the department was his attendance at the religious leadership conference, but that was in a long line of mismanagement and a long line of favoritism, and I believe that Judge Corman was absolutely correct that the religious nature of it wasn't the reason of him, about the religious nature of the event, is because Hiddle tried to downplay it. He said, I wasn't going for any sort of religious reason. I was going because my supervisor, Lori Montes, directed me to attend leadership training, and so she was trying to figure out, okay, what was the purpose of this? Were you going to get leadership training or were you trying to go and engage in a religious practice? And that was the reason why she had the inquiry about the religious aspects. So was the reason that the attending the conference that the thrust of the larger report in the comments may seem to be the reason that this conference was and shouldn't have attended it was because of the religious characteristics. Do you disagree? Well, first of all, I'm sorry, you cut out there for a moment, Judge Ikuda. I said, if you disagree, how do we say that they weren't focused on a protected characteristic? So what they were concerned about was Hiddle disregarding his supervisor's direction to get leadership training specific to fire departments or public sector management. And I would like to point out, contrary to appellant's assertion, that is not an argument that only appears in both she and Hiddle corroborated that in their deposition testimony. So at deposition, Montez reported directing Hiddle to obtain public sector leadership training and testified to frequently speaking with Hiddle about the types of training he should obtain. She provided him examples, several examples, and then he then went to a training completely out of character from those examples. Was there something wrong with the training other than its religious nature? Because there's nothing in the larger report saying it wasn't for fire chiefs. It seemed like the main thing that was wrong with the training was that it had a religious theme or that it was at a church. There were statements about that. She specifically asked him what benefit did it provide the city? And even at the conclusion of her interview, she said, I'm going to give you another chance. Please provide me in writing documentation of what specific training you got that benefits the city. So he did provide, explain why these speakers were so excellent about training, etc. So what was wrong with that other than the religious characteristic? It wasn't the religious characteristic of it. It wasn't that it wasn't it wasn't public sector management or fire specific. And let me explain why that's significant here. Hiddle had a long history of mismanaging his department. He didn't understand how things work. As we pointed out, he tried to defend his subordinates time card fraud because he thought that it benefited the city and he was wrong. And there's all sorts of public sector management and fire department specific trainings out there that talk about things specific to a fire department. How do you operate a 7k work period? How does 4850 workers compensation leave? How do you conduct a large and say that? I mean, the large and it just was odd to me that the larger report didn't say there are many types of trainings that are available for fire chiefs or upper management, and he didn't choose that. Instead, the larger report was focused on whether the conference was religious or not. Why didn't report focus on what you're saying now or did I miss that? So I really can't speak to why Miss Largent didn't focus on that. But I will just point out that Miss Largent, she was a third party investigator, she reached her conclusions, and then the city based their decision on what to do with Mr. Hill's employment, based on the findings of her. So I don't know why she didn't include certain things. About the remarks and opposing counsel raises about Christian coalition and church click, what do we do with those? So both Mr. Hill and Miss Montez agree that the term Christian coalition did not originate from Miss Montez, that it came from an outside dispute from a third party. And concern was that Hiddle was providing favoritism to certain people in the department. And in that particular instance, it was people of his same faith. And there's a long line of complaints going back to 2008, about Hiddle engaging in favoritism on a number of factors, union membership, co-ownership of his home. And as Montez understood that complaint, it was a complaint about improper favoritism. And so she needed to ask him about that, because you can't favor people based on a protected category. And she understood the complaint to be that Hiddle was a member of a clique, an exclusive group, and he was providing preferential treatment to the members of the clique. And you can't do that. We cite to several cases in our brief where such conduct actually violates Title VII. So it was not only appropriate for Montez to question him about these accusations of favoritism, but she had to do that. That was the responsible thing for her to do. So, your honors, one other point that they raised regarding the Skelly meeting. They keep saying that Hiddle wasn't given an opportunity to raise concerns at this hearing, and nothing was raised. There were no accusations regarding religious discrimination. The Skelly hearing, the purpose of that is for someone to say, hey, you got something wrong here. This is what you need to understand. And he didn't do that. So, based on the long history of misconduct, which we've outlined, and his co-ownership of his preferential treatment of members of his vacation home, the fact that he improperly pressured an employee to take down a political sign from his own personal lawn because it supported a position that wasn't backed by the union, and the fact that under his watch, firefighters engaged in campaign activity antithetical to city interests while driving a firetruck resembling city of Stockton firetrucks and wearing uniforms resembling official city uniforms. The list goes on. I know we cover all these in our briefs, so I'm not going to go over them all again. But his attendance at this event was a long line of him exercising poor judgment, using city funds in ways that were criticized by the public, and providing favoritism to employees on reasons other than merit. And that just simply isn't appropriate. And given the voluminous record of non-discriminatory reasons for disciplining him, there's simply no way a reasonable jury could find pretext from these facts. And we believe the answer any other questions? Well, I have no question, but Judge Corman, Judge Acuda? All right, I don't. Looks like you've completed your argument. No further questions. Thank you, Mr. Wilson. Ms. Butler, you have some rebuttal time. Thank you, Your Honor. I'd like to say Judge Acuda was exactly correct that Chief Hiddle does not need to disprove all of the city's various other reasons to establish pretext on either a motivating factor or a but-for theory of causation. And I would point the Supreme Court's decision in Bostock if there is any doubt on that point. Bostock has explicitly said that even under but-for causation, other reasons do need to be disproved. And specifically... Can I ask you one particular question to go back to this leadership event? The Largent report says that on October 5th and 6th, you use city time and resources to attend a religious leadership event. Yes. That is his determination that it was a religious leadership event. Is that some sort of a neutral finding? And if that's true, is that the end of it? In other words, he is telling the city and he is characterizing it as a religious leadership event. By he, do you mean the investigator? Pardon me? Who is the he, the investigator? Largent. Okay, yes. So, Largent viewed the event as a religious leadership event, but that's not a aspect of the training that Largent focused on. So, the religious aspect shouldn't make the leadership training, per se, inappropriate. And in fact, her determination that it did violates Title VII. And I think it's important to look... Is it factually inaccurate? It's not factually inaccurate to characterize the leadership training as including a religious perspective. If she's trying to characterize the event as a religious leadership event because she means it only provides training for the clergy, that would be inaccurate. It's somewhat of an unclear term, but it's clear that the religious nature of the leadership event was the problem. And so, I'd just like to maybe back up a little bit and just say this decision was motivated by Chief Hiddle's religious beliefs. The city knew that Chief Hiddle was a Christian. They told him that he should not be part of a Christian coalition. But was it the city's or did they accept Largent's finding? Well, so... They hired, after all, they did go out and hire a third party. The city... Investigation, and he made this finding. Yes, the city accepted Largent's findings, but I will say the city was the one who brought up the religious nature of the leadership event first. So, the city issued Chief Hiddle the Notice of Investigation. And the Notice of Investigation specifically investigates Chief Hiddle for attending a religious leadership event on city time. So, Largent did not originate this issue with the religious event. That was the city, and the city told Largent to investigate him for that reason. The city accepted Largent's findings, and then in the removal notice, which is by the city, the city says that Chief Hiddle was fired for attending a religious event on city time. And I would also say to, in response to the allegation that, well, this is all based on favoritism, the removal notice has two different causes for removal that are related to the first is solely Chief Hiddle's attendance at the religious leadership event. That has nothing to do with favoritism. Finally... I have one more. I have one more question. It sort of picks up on questions that Judge Kuda asked. Suppose there were six Browns. I'm just picking that number out of the air. I didn't do an actual count. That would provide a neutral basis for his termination. Does the city lose automatically, or does it simply shift the burden to the city to show that they would have done the same thing anyway, even if this religious aspect was out of the case? Judge Gould, I see my time has expired. May I answer the question? It's up to Judge Gould. Yes, please do. Okay. So on these facts, that would be the case. So it doesn't, the other reasons for Chief Hiddle's termination aren't relevant. They can't discount the improper religious motivation. So that won't necessarily be true in every case, but because here, Chief Hiddle has proven his case with affirmative evidence of discrimination using the city's own documents and the city's own comments, the city cannot get summary judgment based on those factors. Well, I'm not talking about summary judgment right now. Suppose the city could prove, let's say in a trial, that they would have done this anyway. And there are some pretty peculiar things that your client was found to have done, and that would, in my view, constitute grounds to terminate him. But as I understand it, where there are arguably dual motives for a particular improper, allegedly improper conduct, the city could still prevail if it showed that it would have done the same thing anyway. So, Your Honor, if- It has, the only thing that changes is that it has the burden of proof that it would have done it anyway. Do you agree with that? That is, that's almost correct, but under a motivating factor, to establish liability under Title VII, all Chief Hiddle has to do is prove that his religion was a motivating factor in his termination. And under a motivating factor theory, the city would then have an affirmative defense that it would have terminated Chief Hiddle anyway. And that affirmative defense goes only to remedies. So that would prevent Chief Hiddle from recovering damages for his termination. But for liability on motivating factor, that is irrelevant, and Chief Hiddle would still be able to get injunctive declaratory relief and attorney's fees. Thank you. Okay, thank you, Ms. Butler. I think that covers our case. I'm going to thank Ms. Butler and Mr. Wilson for their excellent advocacy. This case was well presented on both sides. We will now submit this case and go on to our last case for the day.
judges: GOULD, IKUTA, Korman